UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NESTOR A. PROVEYER,                                   CASE NO.

      Plaintiff,

vs.

THE REALREAL, INC., a Foreign Profit
Corporation D/B/A THE REALREAL

      Defendant.

_____/

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER TITLE III OF THE AMERICANS WITH DISABILITIES ACT AND SUPPLEMENTAL JURISDICTIONAL ALLEGATIONS ESTABLISHING ARTICLE III STANDING

Plaintiff, NESTOR A. PROVEYER, through undersigned counsel, sues Defendant, THE REALREAL, INC., a foreign profit corporation d/b/a THE REALREAL (hereinafter referred to as "THE REALREAL"), for declaratory and injunctive relief, and damages, and alleges as follows: This action is brought under Title III of the Americans with Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

1)     This action is also brought pursuant to 28 C.F.R. Part 36.

2)     This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

3)     Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

4)     Plaintiff is sui juris, and he is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

5)     Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

1

6)      Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase a bag.

7)      Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer.  The computer is Plaintiff's personal property, and a claim for trespass attached to same.

8)      The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

9)      The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

10)     Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

11)     Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

12)     At all relevant times, Plaintiff is and was visually impaired and has POAG end stage – OS / NLP – and severe POAG OD that substantially impairs Plaintiff's vision.

13)     Plaintiff's visual impairment interferes with his day-to-day activities and causes limitations in visualizing his environment.  As such, Plaintiff is a member of a protected class under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

14)     In addition, Plaintiff is an advocate of the rights of similarly situated disabled persons. As such is a "tester" for the purposes of asserting his civil rights and monitoring, ensuring, and determining whether places of public accommodation and/or their respective and associated websites are in compliance with the ADA and any other applicable disability laws, regulations, and ordinances.

15) Plaintiff is limited in the performance of major life activities due to his visual disability and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

16) Plaintiff uses the computer regularly, but due to his visual disability, Plaintiff cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. In order to assist him, Plaintiff uses ChromeVox screen reader software that is readily available commercially. As background, screen reader software translates the visual internet into an auditory equivalent. The software reads the content of a webpage to the user at a rapid pace.

17) "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard." *Andrews v. Blick Art Materials, LLC, 17-CV-767, 2017 WL 6542466, at \*6-7 (E.D.N.Y. Dec. 21, 2017)*.

18) Plaintiff frequently accesses the internet. Because he is significantly and permanently visually disabled, to effectively communicate and comprehend information available on the

internet and thereby access and comprehend websites, Plaintiff uses commercially available screen reader software to interface with the various websites.

19)     Defendant, THE REALREAL, is a foreign profit corporation limited liability company authorized to do business and doing business in the State of Florida.

20)     Defendant, THE REALREAL, is a company that sells men's and women's clothing, bags, jewelry, watches, home décor, and fine art. There is a retail location in Miami-Dade County.

21)     At all times material hereto, Defendant was and still is a private entity which owns and operates retail locations under the brand name "THE REALREAL".  The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, restaurant, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

22)     Because Defendant is a store open to the public, each of Defendant's physical stores is a place of public accommodation subject to the requirements of the ADA, 42 U.S.C. §12182, §12181(7)(B), and its implementing regulations, 28 C.F.R. Part 36.

23)     At all times material hereto, Defendant was and still is an organization owning and operating the website located at https://www.therealreal.com/. Since the website is open through the internet to the public as an extension of the retail stores, by this nexus the website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, the Defendant has subjected itself and the associated website it created and maintains to the requirements of the ADA. The website also services Defendant's physical stores by providing information on its brand and other information that Defendant is interested in communicating to its customers about its physical locations.

24) Since the website allows the public the ability to view the products available at Defendant's locations, purchase products, through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, the website is an extension of, and gateway to, Defendant's physical stores which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). By this nexus between Defendant's retail store locations and the Website, and the fact that the Website clearly provides support for and is connected to Defendant's stores for its operation and use, the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar stores that must comply with all requirements of the ADA. The Website must not discriminate against individuals with disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical stores, which are places of public accommodations subject to the requirements of the ADA.

### ARTICLE III STANDING: ALLEGATIONS ESTABLISHING CONCRETE AND PARTICULARIZED INJURY IN FACT AND REAL AND IMMEDIATE THREAT OF FUTURE HARM

25) Plaintiff sought to, and did, access Defendant's website in order to obtain information necessary to purchase products and services from Defendant's South Florida location. Specifically, Plaintiff attempted to review current menu offerings, product pricing, store hours, promotional items, service availability, and ordering options so that he could arrange the purchase of a bag or other product or service from that physical location through delivery, pickup, or assisted transportation.

26) Plaintiff is legally blind and relies on screen-reader software to navigate websites. Plaintiff does not independently travel to retail establishments without assistance and therefore depends on

accessible online information to determine whether, when, and how to obtain goods and services from Defendant's physical location.

27)     On or about April, 2026, Plaintiff attempted on multiple occasions to access and use Defendant's website using his screen-reader software. During those attempts, Plaintiff encountered specific access barriers, including but not limited to unlabeled graphics, inaccessible drop-down menus, improperly formatted navigation elements, empty links, and content that could not be interpreted by the screen-reader software.

28)     As a direct result of these barriers, Plaintiff was unable to effectively determine store hours, confirm product availability and pricing, review current promotions, purchase items, or arrange the purchase of services, or otherwise complete or meaningfully prepare for a transaction with Defendant's South Florida location.

29)     Plaintiff resides within the geographic market area served by Defendant's South Florida location and regularly purchases similar products and services from comparable establishments within South Florida.

30)     Plaintiff has concrete plans within the next thirty (30) days to attempt to complete a transaction at Defendant's South Florida physical location including coordinating delivery, pickup, or assisted transportation for the purchase of products and/or services at the physical location or store. Plaintiff intends to return to the website and physical location within the next thirty (30) days.

31)     Plaintiff cannot meaningfully arrange or complete such a transaction unless Defendant's website is made accessible so that he may independently obtain necessary information and utilize available purchasing features.

32)     Plaintiff intends to return to Defendant's website in the next thirty (30) days to determine whether the accessibility barriers have been remedied and to complete the intended transaction once the website is accessible.

33)     As a result of the foregoing, Plaintiff has suffered a concrete and particularized past injury and faces a real and immediate threat of repeated future injury that is fairly traceable to Defendant's failure to provide an accessible website and redressable by injunctive relief under the Americans with Disabilities Act.

34)     Plaintiff attempted on a number of occasions in April, 2026 to utilize the Website to browse through the merchandise and online offers, to educate himself as to the merchandise, sales, discounts, and promotions being offered, learn about the brick-and-mortar location, check store hours, and check product pricing with the intent to make a purchase or use or receive a service through the Website or in one of the physical locations in the next thirty (30) days. Plaintiff also attempted to access and utilize the Website in April, 2026 in his capacity as a tester to determine whether it was accessible to blind and visually disabled persons such as himself who use screen reader software to access and navigate company websites.

35)     Plaintiff utilized NVDA ("Screen Reader Software") that allows individuals who are blind or visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. Plaintiff attempted to purchase a product or service on Defendant's website in April, 2026.  However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

### ADA BARRIERS ALLEGATIONS

36)     Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. These barriers are pervasive and include, but are not limited to:

The RealReal: https://www.therealreal.com/

System settings while doing the review:

Operating system: Windows 11

Browser: Google Chrome v. 147.0.7727.56

Screen Reader: NVDA v. 2025.3.3.54605

Video Recorder: Monosnap  V. 5.1.18"

Summary of Barriers (11)

Sign-Up form error not announced: When users attempt to sign up without entering an email address, the error message appears visually but is not announced by the screen reader.

Sign-In error not announced: When users enter invalid credentials, the error message "Invalid email or password" is displayed visually but is not communicated to screen reader users.

Dynamic password field not announced: After entering a valid email address in the Sign-Up dialog, the password field appears dynamically. However, the screen reader does not announce the newly displayed field and keyboard focus does not move to it.

Password rules tooltip not announced: When users navigate to the password field, password requirements appear visually but are not announced by the screen reader. Additionally, invalid password error messages are not announced.

Unlabeled TRR Tip image: On the Homepage, the TRR Tip graphic link is announced as an unlabeled graphic, making its purpose unclear to screen reader users.

Carousel controls lack context and updates: In the "Sell Like a Pro" slider, the Previous and Next buttons are announced without context, and slide changes are not announced by the screen reader.

Product measurement units not announced: On the Product page, measurement values are announced without their corresponding units (e.g., inches), resulting in incomplete product information being conveyed to screen reader users.

Product condition not properly announced: On the Product page, the selected product condition is not announced. Instead, all condition labels are read simultaneously, causing confusion for screen reader users.

Sidebar dialog focus issue: On the Obsessions page, when users add an item to the bag, the sidebar dialog opens but keyboard focus does not move to it, preventing users from interacting with its contents.

Obsess count not announced: On the Product page, in the Similar Items section, the count displayed alongside the Obsess button is not announced by the screen reader.

Checkout field labels not announced on focus: On the Checkout page, field labels such as Name and Address are not announced when users navigate to the fields. They are only announced after validation errors appear.

Impact on Users with Disabilities

These barriers present significant challenges for blind and low-vision users who rely on screen readers to navigate and interact with therealreal.com. When error messages, dynamic content, and field labels are not programmatically announced, blind users

receive no feedback about what has occurred or what action is required, forcing them to navigate the page repeatedly in an attempt to locate information that sighted users see immediately. Barriers such as the unannounced Sign-Up and Sign-In errors, the silent dynamic password field, and the missing password validation rules can prevent blind users from creating an account or logging in entirely, blocking access to the site's core functionality from the very first interaction. The unlabeled TRR Tip graphic, the missing measurement units, and the unannounced product condition further erode the shopping experience, leaving blind users without the information they need to make informed purchasing decisions.

Keyboard users are also affected, most notably by the sidebar dialog focus issue on the Obsessions page, where focus fails to move to a newly opened dialog, and the dynamic password field, where focus is not directed to the newly revealed input. In both cases, keyboard users are left without a reliable way to continue their task without resorting to a mouse.

Violation 1: 1.3.1 Info and Relationships

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

On the Product page, when users navigate to the Product Details section, the screen reader announces the measurement values such as height, width, and depth, but it does not announce the unit of measurement "inch". For example, the screen reader announces "Height: 8.75, Width: 11.25, Depth: 2.75" without specifying that these values are in inches.  As a result, users relying on assistive technologies are not provided with

complete measurement information. This lack of context can cause confusion and makes it difficult for non-visual users to accurately understand product dimensions.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/products/women/handbags/handle-bags/bottega-veneta-intrecciato-chain-padded-cassette-took5

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQCZ8Eo9qK-kToe3gJOX2qpDAYvS7hGhLnYurGx0-Mnjwb8

Violation 2: 1.1.1 Non-text Content

All non-text content that is presented to the user has a text alternative that serves the equivalent purpose, except for the situations listed below. Controls, Input If non-text content is a control or accepts user input, then it has a name that describes its purpose. (Refer to Success Criterion 4.1.2 for additional requirements for controls and content that accepts user input.) Time-Based Media If non-text content is time-based media, then text alternatives at least provide descriptive identification of the non-text content. (Refer to Guideline 1.2 for additional requirements for media.) Test If non-text content is a test or exercise that would be invalid if presented in text, then text alternatives at least provide descriptive identification of the non-text content. Sensory If non-text content is primarily intended to create a specific sensory experience, then text alternatives at least provide descriptive identification of the non-text content. CAPTCHA If the purpose of non-text content is to confirm that content is being accessed by a person rather than a computer,

then text alternatives that identify and describe the purpose of the non-text content are provided, and alternative forms of CAPTCHA using output modes for different types of sensory perception are provided to accommodate different disabilities. Decoration, Formatting, Invisible If non-text content is pure decoration, is used only for visual formatting, or is not presented to users, then it is implemented in a way that it can be ignored by assistive technology.

On the Home page, when keyboard focus moves to the TRR Tip image, the screen reader does not announce the correct name or purpose of the image/link. Instead, it announces "NA. To get missing image descriptions, open the context menu. Unlabeled graphic visited link."  As a result, users relying on assistive technologies cannot understand the purpose of the image or link. This lack of descriptive labeling makes it difficult for non-visual users to access the intended content.

Applicable WCAG 2.1 Standard at Issue: 1.1.1 Non-text Content (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQCGqdPQavtwQ4FWZIZ1QEA2AbmaXdCz3mE616cOmnXLaBA

Violation 3: 2.4.3 Focus Order

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

On the Obsessions page, when users add an item to the bag, a sidebar dialog opens. However, the keyboard focus does not move to the opened dialog. As a result, keyboard users cannot interact with the dialog, close it, or perform any actions within it.  This improper focus management prevents users relying on keyboard navigation from accessing the dialog content and controls, making the functionality difficult to use.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/obsessions

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQABwT-

0q5SzSq0LuOUxFs7cAXiyRS9WezgRz1kqZL-o32A


Violation 4: 2.4.3 Focus Order

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

In the Sign Up dialog, when users activate the Sign Up button after entering a valid email address, a Password field appears between the Email field and the Sign Up button. But, the screen reader does not announce the newly displayed Password field, and keyboard focus does not move to it.  As a result, users relying on assistive technologies may not be aware that an additional required field has appeared. This lack of announcement and improper focus management can make it difficult for non-visual users to proceed with the sign-up process.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQDz60z81A-

XQ5Fvi0REktKvAQ39QwGoClv-MG8ZHVMAYSs


Violation 5: 2.4.4 Link Purpose

The purpose of each link can be determined from the link text alone or from the link text together with its programmatically determined link context, except where the purpose of the link would be ambiguous to users in general.

On the Home page, in the "Sell Like a Pro" slider, the Previous and Next buttons are announced without any contextual information about the slider. Additionally, when users activate the Previous or Next buttons, the slide changes visually, but the screen reader does not announce the updated slide content.  As a result, users relying on assistive technologies cannot understand the purpose of the controls or identify when the slide content changes. This lack of context and feedback makes it difficult for non-visual users to navigate the slider.

Applicable WCAG 2.1 Standard at Issue: 2.4.4 Link Purpose (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQBWbXaJ4EgXSoHuxlPUJXWYAelZkmiqp

HFClYpReDekv8E

Violation 6: 3.3.1 Error Identification

If an input error is automatically detected, the item that is in error is identified and the

error is described to the user in text.

In the Sign In dialog, when users activate the Log In button after entering an unregistered

email address and password, an error message "Invalid email or password" appears

visually. But, the screen reader does not announce this message.  As a result, users

relying on assistive technologies are not informed about the login failure. This lack of

feedback makes it difficult for non-visual users to understand and correct the issue.

Applicable WCAG 2.1 Standard at Issue: 3.3.1 Error Identification (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQDzTTBEou9gS6yBkhUGTFgpAe8siNpNP

Cixd6cy1xeP5MU

Violation 7: 3.3.1 Error Identification

If an input error is automatically detected, the item that is in error is identified and the

error is described to the user in text.

In the Sign Up dialog, when users activate the Sign Up button without entering an email

address in the Email field, an error message "Email is required" appears visually. But, the

screen reader does not announce this message.  As a result, users relying on assistive technologies are not informed about the validation error. This lack of feedback makes it difficult for non-visual users to identify and correct the issue.

Applicable WCAG 2.1 Standard at Issue: 3.3.1 Error Identification (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQA3kLk7rdWYRrLJBXFTfdJtAak3Z2IN-_AHRXrSatfDatE


Violation 8: 3.3.2 Labels or Instructions

Labels or instructions are provided when content requires user input.

On the Checkout page, when users navigate to input fields such as Name or Address, the screen reader does not announce the field labels. The labels are only announced after users leave the field blank and move to the next field, triggering validation.  As a result, users relying on assistive technologies are unable to identify the purpose of the fields while entering information. This makes form completion difficult and increases the likelihood of input errors.

Applicable WCAG 2.1 Standard at Issue: 3.3.2 Labels or Instructions (Level A)

URL Where Issue Was Encountered:

https://bc.therealreal.com/checkout

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQDY10YCF9jBSobpwWOeys0FAcXN4Bcle

DdMghtwIHqjCos

Violation 9: 3.3.2 Labels or Instructions

Labels or instructions are provided when content requires user input.

In the Sign Up dialog, when users navigate to the Password field, a tooltip appears

displaying password requirements. However, the screen reader does not announce these

rules. Additionally, when users enter a password that does not meet the criteria and

activate the Log In button, an error message "Password is invalid" appears visually, but

the screen reader does not announce this message.  As a result, users relying on assistive

technologies are not informed about password requirements or validation errors. This

lack of feedback makes it difficult for non-visual users to create a valid password and

complete the sign-up process.

Applicable WCAG 2.1 Standard at Issue: 3.3.2 Labels or Instructions (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQAkfpr_ux68QLty6DtwiHiiAYcvERKtvdAK

UFkGp7B_UGE

Violation 10: 4.1.2 Name, Role, Value

For all user interface components (including but not limited to: form elements, links and

components generated by scripts), the name and role can be programmatically

determined; states, properties, and values that can be set by the user can be programmatically set; and notification of changes to these items is available to user agents, including assistive technologies.

On the Product page, when users navigate to the Product Condition section, the screen reader reads all condition labels (As is, Fair, Good, Very Good, Excellent, Prestine) available on the scale but does not announce which is the selected / correct condition (Good) of the product as appear on the screen.  As a result, users relying on assistive technologies cannot determine the actual condition of the product. This lack of information makes it difficult for non-visual users to understand the product condition.

Applicable WCAG 2.1 Standard at Issue: 4.1.2 Name, Role, Value (Level A)

URL Where Issue Was Encountered:

https://www.therealreal.com/products/women/handbags/handle-bags/bottega-veneta-intrecciato-chain-padded-cassette-took5

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQDTkUFvGVrYR7UkXLbWDdzUAe-ntpkO4Ty4Am2gdNG4atU

Violation 11: 4.1.2 Name, Role, Value

For all user interface components (including but not limited to: form elements, links and components generated by scripts), the name and role can be programmatically determined; states, properties, and values that can be set by the user can be programmatically set; and notification of changes to these items is available to user agents, including assistive technologies.

On the Product page, in the Similar Items section, when users navigate to the Obsess button, the count displayed along with the button is not announced by the screen reader. As a result, users relying on assistive technologies are not informed about the number of users who have obsessed over the item. This lack of information makes it difficult for non-visual users to evaluate product popularity.

Applicable WCAG 2.1 Standard at Issue: 4.1.2 Name, Role, Value (Level A)

URL Where Issue Was Encountered:

https://bc.therealreal.com/checkout

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/IQCMEV_mjwVOQ4wD1LjqyUnVAe2BnQe M9TFS5RxFY3MSYdQ

37) Although the Website appeared to have an "accessibility" statement displayed and an "accessibility" widget/plugin added, the "accessibility" statement and widget/plugin, when tested, still could not be effectively accessed by, and continued to be a barrier to, blind and visually disabled persons, including Plaintiff as a completely blind person. Plaintiff, although he attempted to access the statement, thus, was unable to receive any meaningful or prompt assistance through the "accessibility" statement and the widget/plugin to enable him to quickly, fully, and effectively navigate the Website.

38) The fact that Plaintiff could not communicate with or within the Website left him feeling excluded, as he is unable to participate in the same shopping experience, with the same access to the merchandise, sales, discounts, and promotions, as provided at the Website and in the physical locations as the non-visually disabled public.

39)     Plaintiff desires and intends, in the near future once the Website's access barriers are removed or remedied, to patronize one or more of Defendant's physical stores and to use the Website, but he is presently unable to do so as he is unable to effectively communicate with Defendant, due to his severe visual disability and the Website's access barriers. Alternatively, as a tester using screen reader software, Plaintiff is unable to effectively access, navigate, and communicate with Defendant through the Website due to his severe visual disability and the Website's access barriers. Thus, Plaintiff, as well as others who are blind and with visual disabilities, will suffer continuous and ongoing harm from Defendant's intentional acts, omissions, policies, and practices as set forth herein unless properly enjoined by this Court.

40)     On information and belief, Defendant has not initiated a Web Accessibility Policy to ensure full and equal use of the Website by individuals with disabilities.

41)     On information and belief, Defendant has not instituted a Web Accessibility Committee to ensure full and equal use of Website by individuals with disabilities.

42)     On information and belief, Defendant has not designated an employee as a Web Accessibility Coordinator to ensure full and equal use of the Website by individuals with disabilities.

43)     On information and belief, Defendant has not instituted a Web Accessibility User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

44)     On information and belief, Defendant has not instituted a User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

45)     On information and belief, Defendant has not instituted a Bug Fix Priority Policy.

46)     On information and belief, Defendant has not instituted an Automated Web Accessibility Testing program.

47)     Defendant has not created and instituted an effective Specialized Customer Assistance line or service or email contact mode for customer assistance for the visually disabled.

48)     Defendant has not created and instituted on the Website a useful or accessible page for individuals with disabilities, nor displayed a link and information hotline, nor created an information portal explaining when and how Defendant will have the Website, applications, and digital assets accessible to the visually disabled or blind community.

49)     The Website does not meet the Web Content Accessibility Guidelines ("WCAG") 2.0 Level AA or higher versions of web accessibility.

50)     Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals who want the safety and privacy of purchasing Defendant's products offered on the Website and in the physical stores from their homes.

51)     Defendant thus has not provided full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and their physical stores in contravention of the ADA.

52)     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

53)     The broad mandate of the ADA is to provide an equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet shopping websites such as the Website at issue in the instant action.

54)     Defendant is, and at all relevant times has been, aware of the barriers to effective communication within the Website which prevent individuals with visual disabilities from the means to comprehend information presented therein.

55)     Defendant is, and at all relevant times has been, aware of the need to provide full access to all visitors to the Website.

56)     The barriers that exist on the Website result in discriminatory and unequal treatment of individuals with visual disabilities, including Plaintiff.

57)     Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged hereinabove, and this suit for declaratory judgment and injunctive relief is his only means to secure adequate and complete redress from Defendant's unlawful and discriminatory practices in connection with its website access and operation.

58)     Notice to Defendant is not required because of Defendant's failure to cure the violations.

59)     Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

60)     Plaintiff has retained the undersigned attorneys to represent him in this case and has agreed to pay them a reasonable fee for their services.

**COUNT I – VIOLATION OF THE ADA**

61)     Plaintiff realleges paragraphs 1 through 53 as if set forth fully herein.

62)     Pursuant to 42 U.S.C. §12181(7)(B), Defendant is a public accommodation under the ADA and thus is subject to the ADA.

63)     Pursuant to 42 U.S.C. §12181(7)(B), the Website is covered under the ADA because it provides the general public with the ability to view the products available at Defendant's locations,

22

purchase products through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand. The Website thus is an extension of, gateway to, and intangible service, privilege, and advantage of Defendant's physical locations. Further, the Website also serves to augment Defendant's physical stores by providing the public information about the stores and by educating the public as to Defendant's brand and available products merchandise sold through the Website and in the physical stores.

64)     Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

65)     Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

66)     In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of

23

the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

67)     The Website must comply with the ADA, but it does not as specifically alleged hereinabove and below.

68)     Because of the inaccessibility of the Website, individuals with visual disabilities are denied full and equal access to and enjoyment of the goods, information, and services that Defendant has made available to the public on the Website and in their physical stores in violation of 42 U.S.C. §12101, et seq, and as prohibited by 42 U.S.C. §12182, et seq.

69)     The Website was subsequently visited by Plaintiff's expert and his determination was that the same access barriers that Plaintiff had initially encountered, as well as numerous additional access barriers, existed. Defendant thus has made insufficient material changes or improvements to the Website to enable its full use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff. Also, when the Website was visited by the expert, although the Website appeared to have an "accessibility" statement and widget/plugin linked on and displayed from its home page, the "accessibility" statement and widget/plugin, when tested, still could not be effectively used or accessed by, and continued to be a barrier to, blind and visually disabled persons such as Plaintiff. Defendant furthermore has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals, nor has it posted on the Website an effective and useful "accessibility" notice, statement, or policy to provide blind and visually disabled person such as Plaintiff with a viable alternative means to access and navigate the Website. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with

disabilities, in violation of 28 C.F.R. §36.302. The lack of a viable and effective "accessibility" notice, policy, or statement and the numerous access barriers as set forth in the Declaration of Plaintiff's expert, Mario Saavedra, attached hereto and the contents of which are incorporated herein by reference, continue to render the Website not fully accessible to users who are blind and visually disabled, including Plaintiff.

70)     More violations may be present on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

71)     There are readily available, well-established guidelines on the internet for making Websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Examples of such guidelines include, but are not limited to, adding alt-text to graphics and ensuring that all functions can be performed using a keyboard. Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to Defendant.

72)     Defendant has violated the ADA -- and continue to violate the ADA -- by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Website are ongoing.

73)     The ADA requires that public accommodations and places of public accommodation ensure that communication is effective.

74)     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R.§36.303(b)(2)

25

specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

75)     According to 28 C.F.R. §36.303(c), public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

76)     Part 36 of Title 28 of the C.F.R. was designed and is implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

77)     As alleged hereinabove, the Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication, and thus violates the ADA.

78)     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to their brick-and-mortar stores, Plaintiff has suffered an injury in fact by being denied full access to, enjoyment of, and communication with Defendant's Website and its physical stores.

79)     Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

80)     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief, including an order to:

i.     Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Website to a functional statement as to the Defendant's policy to ensure persons with disabilities have full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations through the Website and the physical locations.

ii.     Require Defendant to take the necessary steps to make the Website readily accessible to and usable by blind and visually disabled users, and during that time period prior to the Website's being made readily accessible, provide an effective alternative method for individuals with visual disabilities to access the information available on the Website until such time that the requisite modifications are made, and

iii.     Require Defendant to provide the appropriate auxiliary aids such that individuals with visual disabilities will be able to effectively communicate with the Website for purposes of viewing and locating Defendant's stores and becoming informed of and purchasing Defendant's products, and during that time period prior to the Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Website and the physical stores.

iv.     Plaintiff is entitled to recover his reasonable attorney's fees, costs, and expenses pursuant to the ADA. To that end, Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action and has agreed to pay them a reasonable fee for their services.

81)     WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

    a.     A declaration that Defendant's website is in violation of the ADA;

    b.     An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

    c.     An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1]would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations.  Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

    d.     An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

    e.     An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

---



[1]

f.     An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

g.     An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

h.     An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

i.     An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

j.     An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

k.    An award to Plaintiff of his reasonable attorney's fees and costs pursuant to in 42 U.S.C. §§12181-12189, and pursuant to such other laws and statutes that may apply, and further relief as the Court deems just and equitable.

## COUNT II – TRESPASS

Plaintiff realleges paragraphs 1 through 53 as if set forth herein.

82)    Defendant's website contains software analytics. Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

83)    Plaintiff never consented to and was unaware that Defendant's website was placing software on his computer.

84)    The "pop-up" or banner notice that appears on Defendant's website does not properly audibilize the cookies policy in a way where a visually disabled person like the Plaintiff can properly understand or give informed consent to allow tracking cookies to be placed on his computer.

85)    Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on his personal computer, which was done without his knowledge and consent.

86)    Defendant's trespass has damaged Plaintiff by affecting the condition and value of his computer.

87)    On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a barely visible section at the bottom of the page called "Cookies Policy", providing that they use cookies and similar technologies to collect a consumer's information and they obtain

non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

COOKIE POLICY

EFFECTIVE DATE:  AUGUST 29, 2019, UPDATED MARCH 5, 2023.

Our website uses cookies. This policy explains what cookies are, why we use them, and how you can manage their use.

WHAT ARE COOKIES?

Cookies are small text files which are sent to your browser when you visit our website. When you visit our website again, the cookie allows our website to recognize your browser. When you visit our website, cookies may also be sent to your browser by other websites that are used for advertisements on other sites you may visit.

Cookies are useful because they help us make your website experience more enjoyable. They allow us to recognize your device (e.g., your laptop or mobile device) so that we can tailor your experience of our website. You can find out more about cookies at: https://www.epic.org/privacy/internet/cookies/.

WHY DO WE USE COOKIES?

Cookies do many different jobs on this website, such as letting you navigate between pages efficiently, remembering your preferences, remembering your username and password, enabling you to keep goods in your shopping basket, letting us analyze how well our website is performing, and improving your experience. They also help ensure that advertisements you see while you are on other websites are more relevant to you and your interests.

WHAT TYPES OF COOKIES DO WE USE?

We want you to understand the different types of cookies that we use on our website. Some of these cookies are essential to the operation of our website. Others are not essential but help to improve our website by collecting user information or try and improve your experience of our website by remembering your choices.

Generally, our cookies perform up to four different functions:

TYPE 1 – STRICTLY NECESSARY COOKIES – WHICH ENABLE SERVICES YOU HAVE SPECIFICALLY ASKED FOR

We use several cookies which are essential to the operation of this website. For example, these types of cookies let us identify subscribers and ensure they can access the subscription-only areas of this website, enable our website to remember the goods that you add to your shopping cart, provide the necessary security your visit to our website requires, and help ensure the content of the pages you request load quickly. Without these cookies, services that you have asked for cannot be provided.


TYPE 2 – PERFORMANCE COOKIES – WHICH COLLECT ANONYMOUS INFORMATION ABOUT THE WEB PAGES YOU VISIT

These cookies collect information about how visitors use our website, for example, which pages our visitors go to most often, and if they get error messages on those pages. These performance cookies don't collect information that identifies you as an individual – all information they collect is aggregated and anonymous. The information gathered is only used to improve how our website works.

32

We use Google Analytics on our website to help us analyze how our website is used. You can find out more about this popular website analytics tool here: http://www.google.com/analytics/index.html. Google Analytics uses performance cookies to track visitor interactions. For example, by using cookies Google can tell us which pages our users view, which are most popular, what time of day our website is visited, whether visitors have been to our website before, what website referred the visitor to our website, and other similar information. All this information is anonymized. Google takes the privacy and security of your Google Analytics data seriously and you can find out more about how it protects your data here: http://www.google.com/analytics/learn/privacy.html.

TYPE 3 – FUNCTIONALITY COOKIES – WHICH REMEMBER YOUR CHOICES TO IMPROVE YOUR EXPERIENCE.

These cookies allow our website to remember choices you make, such as, remembering your username, the region you are in, and changes you make to various other parts of our website which you can customize, such as your MySales page. The aim of these cookies is to provide you with a more personal experience so that you don't have to reset your preferences each time you visit us.

TYPE 4 – TARGETING OR ADVERTISING COOKIES WHICH REMEMBER YOUR BROWSING HABITS TO TRY AND DISPLAY RELEVANT ADVERTISING WHEN YOU VISIT OTHER ONLINE SITES.

These cookies track your browsing habits so that we can show you advertising which we hope is relevant to your interests. We believe it is useful to show you advertisements that are tailored to your interests. These advertising cookies use information about your web browsing activity to group you with other users who have similar interests and show you advertisements based upon those interests. For example, these cookies may remember that on our website you viewed pages relating to particular products. Based on that information, with our permission, third party advertisers can place cookies on your browser to enable them to show you those products while you visit other sites.

These types of cookies are also used to limit the number of times you see an advertisement as well as to help measure the effectiveness of advertising campaigns.

WE MAY TRACK WHETHER YOU OPEN EMAILS THAT WE SEND

Our emails may contain a web beacon to track who opens an email, when, and whether that user clicks on any of the links in the email. We may use this information to help us analyze which of our users are interested in particular topics. When you delete the email, the web beacon will be deleted.

HOW TO MANAGE COOKIES ON OUR WEBSITE

Cookies do lots of important jobs on our website and help to make your online experience more personal and more enjoyable.

By using our website, you are deemed to consent to the use of cookies as described in this cookie policy.

However, you can disable all our cookies if you choose. If you do so, you may find that significant parts of our website do not work at all, or do not work correctly.

34

88)     Due to Plaintiff's disability, he could not understand Defendant's website and he could not give informed consent to Defendant's installation of data and information tracking software on his computer.  Defendant also could not give informed consent to Defendant's collection of his browsing history and the placement of analytics on his computer.

89)     Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from his computer and determine which programs should be installed and operated on his computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email:info@mendezlawoffices.com
By: _____/s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  786-290-1963
Facsimile:  305-824-3868
Email: radamslaw7@gmail.com
By: _____/s/_____
RICHARD J. ADAMS, ESQ.
FL BAR NO.: 770434